**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACUSETTS**

|  |  |
|---|---|
| RR,<br><br>      Plaintiff,<br><br>      v.<br><br>NATIONAL CONFERENCE OF BAR<br>EXAMINERS (NCBE),<br><br>      Defendant. | ) **EX PARTE – EMERGENCY**<br>) **CONSIDERATION REQUESTED**<br>)<br>) **ORAL ARGUMENT REQUESTED**<br>)<br>) Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES, VERIFIED BY PLAINTIFF, RR

1. Plaintiff, RR, a person with disabilities within the meaning of the Americans with Disabilities Act of 1990 (amended by the ADA Amendments Act of 2008), has spent over 8 months almost exclusively attempting to manage NCBE's ongoing discrimination against her by repeatedly denying her full requested accommodations.

2. Plaintiff, RR, has a long history of high academic achievement, despite having had to work extremely hard to cope with multiple disabilities, in particular, learning disabilities and ADHD, which she was first diagnosed with in 2000. She pursued three graduate degrees at Duke University, beginning a Ph.D. in French in 2013. She added a J.D. and LL.M. in international and comparative law in fall 2015 after her fast-track early decision acceptance into Duke Law and graduated from the Law School with both degrees in spring 2019.

3. While she formally received 50% extended time on tests through college, her disabilities symptoms very clearly worsened and were preventing her from coming close to her usual level of achievement, especially on law school exams during her 1L year. As a result, during the summer of 2016, in consultation with RR's former medical providers in Durham, North

Carolina (specifically, her ADHD coach and psychiatrist), RR's case managers at Duke University's Student Disabilities Access Office (SDAO) decided to increase RR's extended time accommodation from 50% (time-and-a-half) to 100% (double-time). She has not requested nor received anything less since August 2016 and has consistently used that accommodation to its full extent (along with her accommodation of a distraction-free environment, an accommodation not made available for the MPRE). RR has not taken a single test or done any type of timed assessment *without* 100% extended time in almost ten years now.

4. The NCBE's repeated failures to provide RR with her full requested accommodations led to her not taking the November 2025 MPRE and thus, the February 2026 Massachusetts Bar Exam.

5. The NCBE has now rejected again RR's most recent appeal of her accommodations denial for the upcoming March 25th MPRE, with no additional explanation, despite her thorough attempts at effective communication with the NCBE. Her requested accommodations, commonly requested and granted on most standardized examinations, including licensing and credentialing ones, and are not difficult or expensive to provide.

## PARTIES

### Plaintiff, RR

6. Plaintiff, RR, is a United States citizen residing in the City of Boston, in the Commonw3ealth of Massachusetts, where she seeks to become a member of the Bar.

7. RR is a graduate of Duke University School of Law, an ABA-accredited law school, where she earned a J.D. and LL.M.

8. RR has multiple disabilities under the ADA, which require accommodations on timed tests, especially a high-stakes exam required to enter her own chosen profession and to take the

relevant state Bar Exam, both of which have already been delayed, causing RR a total delay of around 6 months already to her licensure.

9. RR is currently scheduled to take the upcoming MPRE on Wednesday, March 25, 2026, at 12:30pm in Woburn, MA.

**Defendant, National Conference of Bar Examiners (NCBE)**

10. Defendant is the National Conference of Bar Examiners (NCBE), a non-profit corporation organized under the laws of Wisconsin.

11. NCBE's headquarters and principal place of business is at 302 South Bedford St, Madison WI.

12. NCBE is the testing agency that creates and manages the administration of the Multistate Professional Responsibility Examination (MPRE), creates UBE portion of various state bar examinations, and manages the character and fitness portions of the bar exams in many jurisdictions. Successfully passing the MPRE is a prerequisite to becoming a licensed attorney in nearly every U.S. jurisdiction, and to taking the MA Bar Exam.

13. NCBE creates the MPRE and directs its administration throughout the country, including in Massachusetts, where one must pass the MPRE before even sitting for the state Bar Exam (administered twice a year).

14. RR had planned to take the MA Bar Exam last month (February 2026) but could not because she could not risk both failing the MPRE and never receiving her necessary, requested accommodations on the Bar Exam, as the MA Board of Bar Examiners (BBE) explicitly asks for applicants' scores and accommodations given by NCBE, which is a far more logical basis for a determination than outdated facts about an individual's life, treating them as though their health, specifically their disabilities, symptoms, and relevant accommodations needs are all static.

3

15. Since the next administration of the MPRE is not until August, if NCBE continues to discriminate against RR, by, *inter alia*, failing to provide her necessary accommodations on the MPRE, her career will be delayed by at least a year, causing her to forego financial gains as she has done since last summer, *just* on her MPRE accommodations application, reconsideration request, and appeal, along with many hours' worth of unproductive communication with NCBE.

### JURISDICTION AND VENUE

16. NCBE engages in business Massachusetts. This judicial action arises from those business activities, specifically involving administration of the MPRE, for which it collects a fee, directly from the test taker, including RR.

17. Therefore, personal jurisdiction is proper pursuant to M.G.L. ch. 223A § 3 (the MA Long-Arm Statute).

18. Upon information and belief, NCBE is a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, including but not limited to indirect federal funds received by other 504-covered entities with which NCBE partners. NCBE also directly benefits from the work of federal, state, and local public officials, who serve on NCBE's governing body and committees, craft its exam questions, and attend or staff its conferences. The NCBE is therefore subject to Section 504 of the Rehabilitation Act of 1973.

19. This action arises under the laws of the United States, specifically, the ADA, 42 U.S.C. § 12101 *et. seq.* and Section 504, 29 U.S.C. § 794.

20. This Court therefore has subject matter jurisdiction over the present action based on a federal question pursuant to 28 U.S.C. §§1331, 1343.

21. Venue is proper in this Court pursuant to 28 U.S.C. §1391, as NCBE intentionally and knowingly does business within the Commonwealth of Massachusetts in its direction of

administration of the MPRE there as has sufficient contacts for personal jurisdiction, and the discrimination at issues occurred in the Commonwealth.

22. Alternatively, venue is cumulatively proper in this Court pursuant to 28 U.S.C. § 1391, since NCBE's alleged acts of discrimination against RR have taken and continue to take place in the District of Massachusetts, where RR also resides.

23. Pursuant to Local Rule 40.1 (d)(1)(C), assignment is proper in the Eastern Division of the District of Massachusetts because RR is the only party in this case who is a Massachusetts citizen and she resides in the City of Boston.

## FACTUAL ALLEGATIONS

24. The Multistate Professional Responsibility Exam (MPRE) is administered three times a year and consists of 60 multiple-choice questions in the form of hypotheticals, obviously implicating a test-taker's ability to engage in close reading comprehension over a significant period of time.

25. In MA, where RR resides currently (as she did when she first submitted her application for accommodations on the MPRE on July 30, 2025), prospective applicants to the Bar must first pass the MPRE—administered 3 times a year, usually in March, August, and November.

26. NCBE decided that RR only merited 50% extended time (and 0 minutes of stop-the-clock break time) and informed her via electronic letter posted to her NCBEX account on August 26, 2025, merely citing the facts of the accommodations granted her twenty years ago on the SATs and SAT subject-tests, as well as the accommodations granted her over 12 years ago on the LSAT.

27. After expending enormous time, effort, an additional finances into a reconsideration request that NCBE itself proved fruitless in an after-the-fact email on October 16, cherry-picking the outdated "Nelson-Denny" test, and stating without any proof whatsoever that RR had 60%

extra time (since there are several electronic versions of this test and all give different amounts of extended time, RR do not even recall how long RR spent on it, although had RR known it would be the several cherry-picked words cited by NCBE in its unofficial email correspondence with me, all initiated by

28. RR was again evaluated by Dr. Eve Fontaine in July 2025 (her third psychoeducational evaluation of RR). an expert psychoeducational evaluator and therapist, who found that, due to RR's learning disabilities, RR is to receive double time and 15 minutes of stop the clock time over the course of a four hour exam.

29. NCBE has denied Plaintiff's full request for accommodations on the MPRE, since August 2025, when she first applied for accommodations on the November 2025 MPRE. *See* Ex. D-1, RR, MPRE Accommodations Application/Summary (July 30, 2025).

30. NCBE's first denial came via electronic letter, granting RR only 50% extended time and 0 stop-the-clock break time. This decision was entirely against the recommendations of Dr. Fontaine, as well as Dr. Michael Hirsch (her psychiatrist for the last 6 years), as well as of all the other qualified professionals who have had the knowledge to opine on that type of thing, including her case managers at Duke's disabilities office, as well as her ADHD coach and psychiatrist in Durham.

31. RR was then sent on a wild goose chase to submit a reconsideration request by September 25, 2025, attempting to guess at what had been wrong with her first application (since she could not get a straight answer out of anyone at NCBE, despite its obligation to communicate with her about its decision). NCBE denied her reconsideration request without any substantive explanation and, upon RR's request for further details, sent RR a highly offensive email on October 16 insinuating that RR was attempting to "enhance" her "performance" with her accommodations request. *See* Ex. E-6, Email from NCBE to RR (Oct. 16, 2025).

32. NCBE's failure to grant RR her full accommodations ahead of the November administration

of the MPRE ultimately led to delays in her ability to take either that exam or the MA Bar Exam in February 2026, as she had planned to do for at least a year now.

33. The MPRE is of particular significance in the District of Massachusetts, one of two jurisdiction that require one to pass the MPRE before every sitting for the Bar Exam.

34. According to the current webpage of the Massachusetts Board of Bar Examiners (MA BBE), regarding accommodations on the Bar Exam, NCBE's granted accommodations

## RR's Disabilities in General

35. Throughout RR's life, especially in school and on timed assessments and tests, she has struggled with disabilities, in particular, learning disabilities and ADHD.

36. She is also diagnosed with additional disabilities within the meaning of the ADA, including her longstanding depression, anxiety, and Obsessive-Compulsive Disorder (OCD), as well as her recently diagnosed post-concussive syndrome and CPTSD (notably diagnosed *after* she began receiving 100% extended time, i.e. double-time, as part of her accommodations on in-school exams, including for 5 of her 7 semesters at Duke Law). These latter intervening diagnoses, as well as the change in her testing accommodations 10 years ago were apparently ignored by NCBE in its determination of RR's accommodations on the MPRE and subsequent reconsideration and appeal denials.

## History of RR's Disabilities and Academic Success

37. RR was born very prematurely, at 28 weeks, weighing 2 pounds, 10 ounces, and spent the first 48 days of her life in the Neonatal Intensive Care Unit (NICU), receiving incubator and other care before her release from the NICU.

38. People who were born prematurely, especially as prematurely as RR, are far more likely to suffer from wide-ranging disabilities than those born after the full 37-week gestational

period.[1] Not only do these disabilities include learning disabilities (LDs), but also, as noted in a recent review article, infants born prematurely are also at higher risk than those born at term of having ADHD (specifically, the inattentive type), as well as psychological disabilities, like depression and anxiety.[2]

39. In fact, had RR been born a couple years earlier, she would likely be, at the very least, far more impaired by far more severe disabilities than she currently has, to the point that academic success would have been an impossibility, including ever going to law school, much less a top-tier one like Duke Law, or ever becoming a licensed attorney. Luckily for her, 1989 marked the lowest ever mortality rate for preterm births up to that point.[3]

40. All of these disabilities match with RR's, especially her learning disabilities (in particular, a specific LD in reading), ADHD (the inattentive type), psychological disabilities, including obsessive-compulsive disorder (OCD), depression, and anxiety. Note that all of these disabilities have been further compounded by intervening life events, including several that amounted to additional, ongoing disabilities: Complex Post-Traumatic Stress Disorder (CPTSD).

---

[1] *See generally* Estefani Hee Chung, Jesse Chou, & Kelly A. Brown, *Neurodevelopmental Outcomes of Preterm Infants: A Recent Literature Review*, 9 TRANSL. PEDIATR., Supp. 1, S3, S4, doi: 10.21037/tp.2019.09.10, https://pmc.ncbi.nlm.nih.gov/articles/PMC7082240/ ("A spectrum of neurodevelopmental morbidities is associated with prematurity."). While this review is recent and not from the time RR was born, reflecting improvements in such outcomes since then, it remains instructive, and the authors still conclude that "[p]reterm infants are at higher risk of adverse neurodevelopmental outcomes when compared to their full-term counter parts. . . . Even preterm infants that appear to be meeting developmental milestones should continue to be monitored closely as *deficits may develop later*. This can affect their quality of life all the way into *adulthood*." *Id.* at S7 (emphasis added). *See also* Richard E. Behrman & Adrienne Stith Butler, eds., Comm. on Understanding Premature Birth & Assuring Healthy Outcomes, *Neurodevelopmental, Health, and Family Outcomes for Infants Born Preterm*, in PRETERM BIRTH: CAUSES, CONSEQUENCES, AND PREVENTION 346-397 (2007), *available online at* NAT'L ACADS. PRESS, http://www.nap.edu/catalog/11622.html. Behrman and Butler point out that "many studies have documented the prevalence of a broad range of neurodevelopmental impairments in preterm survivors. . . . These dysfunctions include language disorders, *learning disabilities, attention deficit-hyperactivity disorder*, . . . behavioral problems, and social-emotional difficulties. Preterm infants are more likely to have lower intelligence quotients and academic achievement scores, experience greater difficulties at school, and require significantly more educational assistance than children who were born at term." *Id.* at 346 (emphasis added).
[2] *See* Chung, Chou, & Brown, *supra*, at S4 (citation omitted).
[3] *See* Cntrs for Disease Control & Prevention (CDC), *Infant Mortality -- United States, 1989*, 41 MORBIDITY & MORTALITY WKLY. REP. (MMWR) 81-85 (Feb 7, 1992), https://www.cdc.gov/mmwr/preview/mmwrhtml/00016039.htm.

41. Furthermore, RR's "very low" birthweight (defined as less than 1,500 grams (3 pounds, 5 ounces),[4] placed her at an even greater risk of developing disabilities, not to mention death.[5]

42. RR's difficulties learning were first observed at or around the age of 6 by her second-grade teacher at Zervas Elementary School in Newton, MA. RR's teacher, who relayed her observations to RR's parents.

43. As academic demands increased, RR struggled more and more with issues surrounding learning, in both school and other activities, leading her parents to seek a psychoeducational evaluation of RR to better understand the difficulties she was experiencing.

44. RR's first psychoeducational evaluation occurred in 2000 at age 10 while she was in fifth grade and was conducted by Louise Hozid, Ed.D. That evaluation was based, like all of RR's subsequent psychoeducational evaluations, on an extensive battery of tests.[6]

45. Her 2000 psychoeducational evaluation resulted in diagnoses of a nonverbal learning disability and Attention Deficit Disorder Without Hyperactivity.[7]

46. Among the many observations made in RR's 2000 psychoeducational evaluation was RR's specific difficulty with reading comprehension.

---

[4] *See* World Health Org. (WHO), *International Statistical Classification of Diseases and Related Health Problems* (10th rev., 2nd ed., 2004).

[5] "The smallest and most immature infants have the highest risk of health problems and neurodevelopmental disabilities." Behrman & Butler, *supra*, at 346. Moreover, a comprehensive report published in 1990 notes that "[t]he high death rate among newborns in this country is related strongly to the number of infants whose weight at birth is lower than normal for their gestational age or who were born prematurely. . . . [T]he lower the birthweight, the greater the immaturity and risk of death." Furthermore, studies from two decades prior to 1990 "reveal that, compared with infants weighing a more normal 3,000 to 3,500 grams (6 lbs. 5 oz.) and up, babies weighing less than 2,500 grams are almost 40 times more likely to die in the weeks after their birth. The likelihood of death increases as birthweight decreases. If small babies survive the neonatal period, they continue to have a higher risk of death during their first year, accounting for 20 percent of infant deaths during that period." Suzanne Wymelenberg, Inst. of Med., *Prenatal Care: Having Healthy Babies*, *in* Science and Babies: Private Decisions, Public Dilemmas 96, 100 (1990), *available from* Nat'l Academies Press, https://www.ncbi.nlm.nih.gov/books/NBK235274/. *See also* Ruoqing Chen, et al. *Risk of Intellectual Disability in Children Born Appropriate-for-Gestational-Age at Term or Post-Term: Impact of Birth Weight for Gestational Age and Gestational Age*, 35 EUR. J. EPIDEMIOL. 273-282 (Mar 2020), doi: 10.1007/s10654-019-00590-7, *published online* Dec 2, 2019, https://pmc.ncbi.nlm.nih.gov/articles/PMC7154017/.

[6] *See* Ex. A-11, Louise Hozid, Ed.D., Psychoeducational Evaluation of RR (Feb 2000), at 3 (listing the tests administered to RR for the evaluation).

[7] Note that the official diagnostic title (i.e. in the DSM or ICD) of some of RR's disabilities have changed since she was first diagnosed.

9

47. The 2000 evaluation also emphasized RR's need for extended time on tests.

48. She was re-evaluated in 2004 at the age of 14 after her 9th grade year (at Newton South High School in Newton, MA by Louise Hozid, Ed.D. (again), along with Arthur J. Brown, Ph.D.

49. The results of RR's 2004 psychoeducational evaluation were consistent with those of the 2000 evaluation, including her diagnoses of a nonverbal learning disability and ADHD without hyperactivity, which the evaluators noted impacted her cognitive functioning and learning.

50. Her 2004 evaluation also notes that RR's difficulties (her specific diagnoses) can also be understood more generally as an executive function disorder, identifying RR's variability in functioning in several areas, including processing speed; strategies to manage complex material (specifically in terms of organization, coding, and recollection), forgetfulness while trying to complete a set of tasks even when focused, ability to stay on-task; and tendency to become quickly overwhelmed and fatigued.

51. The 2004 psychoeducational evaluation, as in 2000, also reiterated RR's need for extended time on tests, both in school and on standardized exams. It specifically notes that extended time had been the only accommodation RR had found helpful up until then.

52. Despite her disabilities and the stigma and discrimination she repeatedly encountered as a result of her disabilities and extended time accommodation, RR achieved at a very high level in both her middle school and high school classes because she received proper accommodations.

53. RR had §504 plans throughout middle and high school and generally received 50% extended time (time-and-a-half) on school quizzes and tests, as well as on all of the standardized exams she took (with the notable exception of the MCAS, which granted all students unlimited time).

54. RR also consistently achieved very high scores on standardized exams, including the MCAS

10

(10th grade), the PSATs, the SATs and SAT subject tests (11th grade), and the Advanced Placement (AP) exams (RR took 4 AP classes during her senior year of high school). She also consistently made the high honor roll (meaning, she had grades of A- in all classes for that semester) in high school.

55. For her success on the MCAS, RR was awarded the John and Abigail Adams scholarship, and for her success on the PSATs, she was rewarded with a Letter of Commendation from the National Merit Scholarship Corporation (NMSC). She also medaled all three times she competed in *Le Grand Concours* (National French Contest).

56. RR graduated from Newton South High School in 2007 at the top 10% of her class.

57. Prior to graduation, RR applied (early-decision) and was accepted into Carleton College.

58. The discrimination RR faced included teachers refusing to give her legally-mandated extended time accommodation, often outing her to her peers and telling RR that she was "cheating" because of her necessary accommodations, despite them being granted to RR under a legitimate §504 plan.

59. In college, RR continued to receive time-and-a-half on all tests or other timed assessments.

60. She also continued to achieve at a very high level in college, receiving excellent grades, for which she was rewarded with membership on Mortar Board, of which she was Vice President at Carleton her senior year. RR also received an exemplary rank on her sophomore "writing portfolio."

61. In 2011, RR graduated from Carleton College *magna cum laude* in 2007 with distinction in both her major (French and Francophone Studies) and on her senior thesis project, as well as with honors for her Mortar Board membership.

62. RR could not take the GRE with accommodations as she was living abroad for two years prior to living in Durham, NC and beginning her studies at Duke University. However, she took extensive ameliorative measures to obtain scores, which, according to Dr. Fontaine,

were not commensurate with her past scores on standardized tests.[8]

63.    RR received 50% extended time on the LSATs in 2014, as was *then* recommended by Dr. Fontaine. Had LSAC followed the throw-away GRE reasoning NCBE arbitrarily pointed to for the very first time in its last denial of her accommodations request, RR would not have had any accommodations on the LSAT at all.[9]

## Current State of RR's Disabilities

64.    In 2013, RR enrolled at Duke University for graduate studies, She began a Ph.D. program in the Department of Romance studies, and in 2015, she enrolled at Duke Law, in a combined J.D./LL.M. program.

65.    RR required additional accommodations: Until 2015, when she started her law degrees, deadline extensions were already informally given every time RR requested on nearly every final paper she had had for two years. She was also given as much time as needed to complete her Arabic exams over those years.

66.    She received these informal extensive accommodations, despite her formal registration with Duke Universities disabilities office starting in 2014 (after she underwent a psychoeducational evaluation following a couple years abroad).

---

[8] *See* Ex. A-2, Fontaine, PE Eval 2025, at 7, for Dr. Fontaine's apt summary of RR's experiences with the GRE and the inconsistency of those scores with her past achievements on similar, *recent* standardized tests ("[RR] spent an entire year studying daily and preparing to take the GREs, with emphasis on timing herself for each section. Despite these preparation efforts, she was unable to complete each section within the standard time permitted. On [RR's] first administration of the GRE, a review of her test scores showed that her Verbal Reasoning skills were at the 87th percentile, her Quantitative Reasoning skills were at the 64th percentile, and her Analytical Reasoning skills were at the 56th percentile. These scores are clearly much lower than her performance on previous standardized testing (i.e. PSAT, SAT, and AP exams). To improve her scores, [RR] re-took the GRE [also] in Tel Aviv. She continued to experience issues with completing this exam within the time constraints. A review of her test scores showed that her Verbal Reasoning skills were at the 93rd percentile, her Quantitative Reasoning skills were at the 68th percentile, and her Analytical Reasoning skills were at the 93rd percentile. Overall, these scores continued to be lower than expected when compared to her past performance on standardized exams when granted extended time."). *See also* Ex. A-6, Fontaine, PE Eval 2019, at 7-8 (stating the same or similar); Ex. A-7, Fontaine, PE Eval 2014, at 4 (stating the same or similar).

[9] *See* Ex. C-4, LSAC, Letter of Accommodations Confirmation.

12

67. Again, although RR did very well on the LSAT, which she took twice during the fall of 2014, her score in the 94th percentile was also lower than expected, in comparison with most other standardized exams she had taken and was even inconsistent with her grades in school.

68. The impact of RR's disabilities on her ability to reach her aptitude on tests continued to deteriorate, especially in law school, where exams are strictly timed.

69. Thus, during the summer of 2016, RR's case managers at Duke's Disabilities Office, consistent with the recommendations of RR's-then medical providers (specifically, her ADHD coach and psychiatrist) decided to increase her testing accommodations to 100% extended time, a.k.a. double-time (in a distraction-free environment).

70. Despite passing all of her law school classes, RR experienced constant difficulties on both exams and papers and was unable to fully complete a single exam, regardless of the increase in her extended time to 100% (double-time), which she used to the full extent on every test.

71. She consistently submitted papers after the deadlines due to the amount of time she found herself needing to spend on them, significantly more than her pre-grad school academic career.

72. Adding to the exacerbation of her disabilities' impairments, RR experienced several intervening life events over the last decade that resulted in *ongoing* disabilities diagnoses comorbid with her LDs and ADHD, the primary disabilities requiring accommodations.

   a. Post-concussive syndrome (first diagnosed in August 2018, following a December 2016 concussion that required her head to be stapled together. RR continues to experience symptoms, including migraines with aura that sometimes lead her to collapse and even lose consciousness. These episodes are variable and unpredictable.

   b. CPTSD (a cumulative diagnosis first officially received in 2020). RR experiences frequent intrusive thoughts that cause her to lose time. As with her post-concussive syndrome episodes, intrusive thoughts due to her CPTSD are unpredictable and quite

variable in severity and extent.

73.    Despite these difficulties, RR graduated from Duke with a J.D. and a LL.M. in focused on international and comparative law.

74.    In the years immediately following her graduation form Duke Law, RR was still working on her Ph.D. and wanted to enter academia, and so did not plan on entering the practice of law in the traditional sense, thus she did not take the bar.

75.    In 2020, RR withdrew from her Ph.D. program.

76.    After working on some political campaigns for candidates that championed issues she believed in, by 2025, she decided to sit for the Massachusetts Bar, and pursue a careere in public interest law.

**The Multi-State Professional Responsibility Exam (MPRE)**

77.    The exam consists of 60 multiple-choice questions based on hypotheticals that a test-taker must *read* in order to answer the question.

78.    The MPRE is wholly administered by the Defendant, NCBE.

79.    In Massachusetts, a candidate for Bar admission must achieve a passing score in order to be eligible to sit for the actual Bar exam. (See Rules of the Board of Bar Examiners, Rule I as authorized by SJC Rule 1.1.5 and Rule 7.1).

80.    As she has on all other exams since 2016, RR requires 100% extended time on the MPRE. MPRE does not offer RR's other consistently recommended and implemented recommendation of a distraction-free environment.

**NCBE Accommodation Application process**

81.    Objectively, NCBE has one of the most grueling, complicated, and confusing procedures for disability accommodations applications.

14

82. NCBE has separate, lengthy guidelines regarding the documentary evidence required for every single type of disability, leading the NCBE-required evaluation

83. In RR's case, this meant a new psychoeducational evaluation (that had to be conducted in the previous 12 months.

84. RR obtained the service of her previous evaluator, by Dr. Eve Fontaine, who conducted the evaluation.

## RR's Recent Psychoeducational Evaluations and Accommodations Recommendations

85. RR has worked with her current psychoeducational evaluator, Dr. Eve Fontaine, since 2014, when she first evaluated RR ahead of the LSATs and recommended time-and-a-half, based on a full battery of tests, interviews, etc.

86. Dr. Fontaine is a qualified professional within the meaning of the ADA.

87. Dr. Fontaine re-evaluated RR in 2019 for the MPRE[10]. This evaluation occurred in July, 2025.

88. Based on a complete battery of tests, including ones to specifically examine the effects of a massive concussion RR sustained in December 2016, *after* Duke University's decision to increase RR's accommodations, an action that would certainly have occurred after her concussion had it not been required already.

89. Dr. Fontaine concluded RR's learning disabilities and ADHD mandated she receive accommodations in the form of 100% extended time (remaining the same as 2019) and was accompanied by the very reasonable recommendation of up to fifteen minutes of stop-the-clock time over what should be a four-hour exam for RR.

90. This psychoeducational evaluation was required by the NCBE, which also requires that those evaluations occur within the previous 12 months.

---

[10] RR initially planned to take the MPRE and Bar Exam (in New York) in 2019; however, before submitting her accommodations application to NCBE, she decided against taking the exam at that point in order to focus solely on her research and other academic pursuits.

15

91. The evaluation was very time-consuming, and very costly, as was the additional documentation RR obtained over the course of about a month for her reconsideration request, which the NCBE effectively revealed after the fact (in its October 16, 2025 email) had been pointless. *See* Ex. E-6.

**NCBE's Repeatedly Denies RR's Full Accommodations Request**

92. On July 30, 2025, RR submitted her initial application for accommodations on the November 2025 MPRE.

93. RR submitted an abundance of current, recent, and historical documentation of her disabilities (most of which she has had since childhood, especially her learning disabilities and ADHD).

94. Despite RR's history of learning disabilities, and the results of Dr. Fontaines's evaluation, **NCBE chose to unlawfully ignore these materials, and merely granted RR time and a half.**

95. RR spent months attempting to receive an explanation for NCBE's refusal to grant her requested and recommended accommodation on the MPRE, specifically, 100% extended time, an accommodation she has been recommended and always granted for the last decade.

96. RR's constant efforts to communicate with NCBE were virtually never reciprocated.

97. For example, RR repeatedly asked NCBE why it had not considered her 2025 psychoeducational evaluations and failed to defer to the recommendations of *all* her current and recent qualified professionals, even quoting this rule of deference in her emails. NCBE consistently ignored those questions. *See* RR's emails to NCBE in exhibits of Series E.

98. The only reasoning that NCBE put forth for denying RR the full extent of her accommodations came in two separate emails.

99. In its October 16, 2025, email (Ex. E-6), NCBE noted that RR had scored very highly on

16

standardized testing in the past, and then childishly insinuated that RR was simply trying to up her score, when in reality RR was asking for her needed accommodations and noting more.

100. It also gave one additional point of denial (again, only over that one email, *see* Ex. E-6), that RR scored well on *one* of the *several* tests administered by Dr. Fontaine (The Nelson Denny test), concluding that this alone meant she did not require the full extent of her accommodations.

101. **In other words, Defendant NCBE not only wholly ignored Dr. Fontaine's conclusions, but more perversely, Defendant utilized Dr. Fontaine's report to cherry-pick, after the fact, items in isolation, that they thought (incorrectly) would support their own unlawful decision.**

102. From these communications, it became abundantly clear that RR had wasted her time, money, and enormous effort acquiring additional, totally unnecessary documentation for her reconsideration. Request, as well as blatantly discriminatory statements about RR on the basis of her disability.

103. Despite the NCBE's discriminatory, comments to RR in its email responses to her, as well as its entirely inappropriate advice that she consider obtaining "current" documentation (which NCBE has been in possession of since July 30, 2025), RR submitted a new appeal of its unlawful denials of her full accommodations request, this time for the March 2026 MPRE, which is currently scheduled for March 25, 2026.

104. As expected, NCBE again denied RR her necessary accommodations on the MPRE, specifically, 100% extended time, officially rejecting her appeal at the end of the day February 9, 2026.

105. NCBE Denied RR's Latest Appeal Based on the Same Irrelevant, Outdated Details Without Reference to Current or Recent Documentation and Without Further Explanation, Despite

17

RR's best efforts to obtain one all along. It also gratuitously added another cherry-picked detail never before mentioned in its denials about RR's GREs, further demonstrating its failure to actually examine RR's underlying documentation.

106. RR has already filed a complaint with the United States Department of Justice (DOJ) but has yet to hear back from it.

107. The very short timeframe in which RR had to compile this entire case, after months of unreciprocated attempts at communication with NCBE regarding its unlawful failure to grant her necessary accommodations on the MPRE, should not be counted against RR. Instead, RR hopes the Court will consider the time and effort she expended as part of the harm she has had to endure and continues to endure, as well as a reflection of her likelihood to succeed on the merits. This case has an unusually extensive factual record, including exhibits already in NCBE's possession, which the Court deserves the opportunity to examine in full (unlike NCBE did with respect to RR's accommodations request and subsequent attempts to understand and change its still illogical denial). Along with this Complaint, her Motion for an Ex Parte TRO, or, Alternatively, Expedited Preliminary Injunctive Relief, and carefully organized Exhibits, she also had to file an additional two procedural motions, each accompanied by a separate Affidavit, all to ensure her privacy, thereby protecting her from yet further harm.

108. Working nearly non-stop to prepare this case since receiving NCBE's last denial the evening of February 9, 2026, proceeding pro se, with little outside help, even less sleep, all on top of preparing another accommodations application for the MA Bar Exam, due April 1, 2026,[11]

---

[11] RR has prudently chosen not to submit her application for accommodations on the MA Bar Exam until this Court has ruled on her present motion, given the weight that NCBE's accommodations determination for the MPRE carries in the MA BBE's own assessments of accommodations requests. *See* Ex. G-16, MA Board of Bar Examiners (MA BBE), *Nonstandard Testing Accommodations for the Bar Exam* (specifically listing three unconditionally required pieces of information from applicants, including the accommodations granted them by NCBE for the MPRE, which RR has not even taken yet, much less passed).

18

not to mention readying herself to study for the MPRE on March 25 (in the hopes that this Court will rule on her ex parte motion) one can hardly call the complete product of all filings and exhibits untimely.

109. It would be remiss not to point out here, that RR is a person with multiple disabilities under the ADA, most of which have been severely exacerbated by the emotional and physical toll to her health of NCBE's denials of her necessary accommodations (which she expected from an organization with NCBE's reputation, but not to such an audacious extent), its failure to reciprocate communication, and its reliance on repugnant blatantly discriminatory statements in an attempt to stop RR from continuing to question its determination and denials.

## CLAIMS FOR RELIEF

### COUNT I: Violation of the ADA

110. RR fully incorporates by reference the entirety of the foregoing paragraphs as if set out herein.

111. RR is an individual with a disability within the meaning of the Americans with Disabilities Act, ("ADA") 42 U.S.C. § 12101 et. seq.

112. The NCBE administers the MPRE, which is an examination related to applications and credentialing for postsecondary education, professional, and trade purposes, within the meaning of the ADA, 42 U.S.C. § 12189.

113. NCBE's discriminatory policies and practices have and continue to violate RR's rights under the ADA and the regulations established pursuant to it. Defendant's discriminatory conduct, policies, and practices include, but are not limited to the following:

    a. **NCBE's Denial of Plaintiff's Full Accommodations as Recommended by Dr. Eve Fontaine (a qualified Professional within the meaning of the ADA).**

19

b. **NCBE's stated reasons for denials citing only far outdated, irrelevant test scores and without consideration of any of RR's current or recent documentation (which is, under the ADA, already overly-sufficient to support granting her full requested accommodations).**

c. **Cherry picking items from Dr. Fontaines report, while wholly ignoring her conclusions.**

d. NCBE's Failure to Effectively Communicate the reason for their Denial, Sending Plaintiff on a Wild Goose Chase for additional documentation that was already *unnecessary*, just to file a reconsideration request that she found out had been entirely futile, based on NCBE's email to her October 16, 2025. *See* Ex. E-1, Emails with NCBE.

e. NCBE's Denial of Reconsideration Request and Revelation of their Prejudicial Biases Against Persons with Disabilities and their Totally Invalid Basis for the NCBE's Determination as to RR's Accommodations on the MPRE, Clearly Showing that the Full Request Would Never Be Granted and that RR Engaged in Weeks of Fruitless and Costly Work on the Reconsideration Request, forcing RR to incur unnecessary costs for unnecessary documentation.

f. Recommending new unnecessary documentation, in spite of the already current documentation submitted, including a medically unsound recommendation to have a repeat evaluation in January 2026, despite having undergone, paid for, and submitted an extensive psychoeducational evaluation in July 2025 with her initial application and despite another current, unnecessary psychiatric report, obtained for her reconsideration request, later revealed by NCBE to have been pointless, given its blatantly prejudicial views of persons with disabilities as being inherently less capable of achieving high aptitude as persons without disabilities.

g. NCBE's communications, especially the October 16th email, constitute discrimination in and of themselves under the ADA, which does not required intent.

h. NCBE's Decision Delayed RR's Taking of Both the MPRE and MA Bar Exam; Accommodations on the Latter are Directly Impacted by NCBE's Determination

114. RR will continue to face irreparable harm in the immediate future if NCBE continues its unlawful denial of RR's full requested accommodations and unless this Court grants RR's motion for injunctive relief by enjoining NCBE from their continuous violations of RR's rights under the ADA and ordering NCBE to provide RR with her full initial request for accommodations, as supported by her July 2025 NCBE-required psychoeducational evaluation (all that the ADA requires from such applicants).

115. This irreparable harm includes but is not limited to the following:

a. Inability to take the MPRE on March 25th, 2026, the date RR is currently scheduled to take the exam with only time-and-a-half, not her full requested accommodations.

b. Additional delay of both the MPRE and MA Bar Exam for yet another 6 months.

c. Additional 6-month in the start of RR's ability to work as a licensed attorney

d. Decreased ability to perform on either or both the MPRE and Massachusetts Bar Exam and possible failure of either: *since the Massachusetts Board of Bar Examiners explicitly states that the NCBE's accommodations determination will be given significant weight and is known to prevent qualified persons with disabilities from receiving their legally entitled accommodations on the bar exams taken after the MPRE when NCBE fails to provide the necessary accommodations.*

e. Additional costs that RR will not be able to afford (particularly given that the NCBE requires a psychoeducational evaluation be performed **within 12 months** of applications, which it has already failed to consider without any explanation at all (only citations of outdated test scores that do not qualify for the NCBE's own

standards of recency for the required documentation, a repugnant hypocrisy that unfairly discriminates against and among persons with disabilities. Other costs that will be incurred yet again include fees. RR had no choice but to schedule an exam within the 48-hour window after receiving the denial of her reconsideration request, which is insufficient time to do anything but schedule the exam and thereby lose at least half the fee, as RR did for the November 2025 MPRE.

    f.   Irremediable loss of opportunity to pursue her chosen profession and the waste of the costs of her legal education.

    g.   Possible entire loss of RR's chosen career

116. As a result of the NCBE's continuous violations of the ADA, RR has already suffered and will imminently suffer the irreparable harm of not being able to take or pass the March 25th, 2026, MPRE. Other future irreparable harms RR faces as a result of NCBE's violations include but are not limited to: lost employment opportunities; additional significant out-of-pocket financial losses; and additional severe emotional distress and anguish.

117. NCBE's conduct constitutes ongoing and continuous violations of the ADA. Unless enjoined by this Court, NCBE will continue its unchecked violations of the ADA, and those violations will continue to inflict irreparable and immediate on RR, who has no adequate remedy at law.

118. As a result, RR is entitled to injunctive relief under Title III of the ADA, 42 U.S.C. § 12189.

## COUNT II: Violation of Section 504 of the Rehabilitation Act of 1973[12]

119. RR incorporates by reference the foregoing paragraphs as if set forth fully herein.

120. Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

---

[12] Rehabilitation Act of 1973, Section 504, *codified at* 29 U.S.C. § 794.

program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

121. NCBE receives federal financial assistance through its partnerships and from its individual personnel, thereby subjecting itself to the requirements of Section 504.

122. In particular, it is a recipient of funds through the Veterans Association's education benefits for those covered by Post-9/11 GI Bill (Chapter 33), Montgomery GI Bill Active Duty (Chapter 30), Montgomery GI Bill Selected Reserve (Chapter 1606), or Survivors' and Dependents' Educational Assistance (Chapter 35).

123. RR is a qualified individual with a disability under Section 504.

124. NCBE has, solely by reason of RR's disabilities, excluded RR from access to and the benefits of the MPRE and otherwise discriminated against her in its services, policies, and practices.

125. NCBE's actions, detailed above and incorporated herein, constitute intentional discrimination on the basis of disability in violation of Section 504 by failing to provide her with the reasonable accommodations on the MPRE, as she requested on July 30, 2025, and as were recommended, particularly, 100% extended time (i.e. double-time).

126. NCBE's actions were intentional or carried out with deliberate indifference to RR's rights protected under Section 504.

127. As a proximate cause of NCBE's discrimination, RR suffers and continues to suffer harms including but not limited to economic and non-economic harms, actual monetary losses, future monetary losses, as well as other injuries and financial losses, including denial of equal treatment and access to its services, specifically, the MPRE, which directly impacts RR's access to the MA Bar Exam.

## JURY DEMAND

128. Trial by Jury is hereby demanded for all claims so triable

23

**PRAYER FOR RELIEF**

129. An order compelling the NCBE and any relevant contracted agents to immediately cease and desist from its refusal to accommodate Sampson's full request for her necessary accommodations on the MPRE and compelling the NCBE to immediately comply with the ADA and Section 504 of the Rehabilitation Act by providing RR with her full requested appropriate accommodations on the MPRE: 100% extended time (double-time), accompanied by up to fifteen minutes of stop-the-clock breaks.

130. An order compelling the NCBE to provide the same accommodations on all future administrations of the MPRE, should RR fail the exam on March 25th, without any further question, inquiry, or request for additional documentation, including any additional psychoeducational or related evaluation.

131. If the Court deems it appropriate, an order that would grant appropriate notice of, what RR's case makes even clearer, is an ongoing problem with to other persons with disabilities who have recently or will soon apply who were not granted their accommodations in full or in part for similarly unlawful reasons such that those determinations at the very least, do not adversely affect future determinations by other testing agencies.

132. An order granting declaratory relief.

133. An order awarding compensatory and/or nominal monetary damages and any other available damages this Court finds just and proper.

134. An award for attorney fees, costs, and expenses of suit incurred herein, including but not limited to: the cost of documentation required or recommended and never considered by the NCBE, specifically RR's psychoeducational evaluation of July 2025 and addendum to that evaluation; filing fees; and lost registration fee for the November MPRE.

135. Award for such other and further relief as the Court may deem just and proper.

24

Respectfully Submitted,

RR

RR, *pro se*

Dated: 3/23/26

## VERIFICATION OF COMPLAINT

I, the undersigned RR, am over the age of eighteen years and the Plaintiff in this action. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the Commonwealth of Massachusetts, that the foregoing statements are true and correct to the best of my knowledge.

RR

RR, *pro se*

Dated: 3/23/26