## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACUSETTS

|  |  |  |
|---|---|---|
| RR, | ) | **EX PARTE – EMERGENCY CONSIDERATION REQUESTED** |
| | ) | |
| Plaintiff, | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| NATIONAL CONFERENCE OF BAR | ) | |
| EXAMINERS (NCBE), | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER, OR, IN THE ALTERNATIVE, EXPEDITED PRELIMINARY INJUNCTIVE RELIEF

FILED
IN CLERKS OFFICE
2025 MAR 23 AM 9: 29
U.S. DISTRICT COURT
DISTRICT OF MASS.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES    2

INTRODUCTION    4

I. FACTUAL BACKGROUND    6

    A. RR's Disabilities and Academic Success    6
        *1. Documented History of RR's Disabilities*    *6*
        *2. RR's Testing Accommodations and Consistently High Academic Achievement*    *7*
        *3. Documented Current State of RR's Disabilities*    *8*

    B. Multistate Professional Responsibility Exam (MPRE) and Accommodations Requests    10
        *1. Significance and Format of MPRE*    *10*
        *2. NCBE's Procedures for Accommodations Applications and Appeals on MPRE*    *11*

    C. NCBE's Repeated Denials of RR's Accommodations    11

II. LEGAL STANDARDS    13

    A. Four-Part Framework for Preliminary Injunctive Relief, Including a TRO    13

    B. Standards and Principles Relevant to Emergency Issuance of an Ex Parte TRO    14

III. ARGUMENT: NCBE'S DISCRIMINATION AGAINST RR    15

    A. RR Is Highly Likely to Succeed on the Merits    15
        *1. Legal and Regulatory Background of ADA and ADAAA*    *15*
        *2. RR Has Multiple Disabilities Within the Meaning of the ADA, and NCBE Has Repeatedly Failed to Provide Her Requested Accommodations, As Recommended by Dr. Fontaine*    *17*

    B. RR Faces Immediate, Irreparable Harm: Inability to Take March 2026 MPRE (and July 2026 MA Bar Exam), Already Unlawfully Delayed by NCBE    21

    C. Balance of Burden Tips Far in Favor of RR    22

    D. Granting RR's Motion Is in the Public Interest; Denying It Would Hurt that Interest    23

CONCLUSION: EXTRAORDINARY RELIEF FOR EXTRAORDINARY VIOLATIONS    24

<u>**TABLE OF AUTHORITIES**</u>

**Laws:**

Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*
Title III of ADA, 42 U.S.C. § 12181 *et seq.*

ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 122 Stat. 3553 (2008), *codified at* 42 U.S.C. 42 U.S.C. § 12101 *et seq.*

Rehabilitation Act of 1973, Section 504, *codified at* 29 U.S.C. § 794

**Regulations & Guidance:**

28 C.F.R. § 36.105
28 C.F.R. § 36.301
28 C.F.R. §36.309

**Procedural Rules:**

Fed. R. Civ. P. 65(b), (c)

**Cases:**

*Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-cv-99 (S.D. Ohio Aug. 27, 2019)

*Bonnette v. D.C. App. Ct.*, 796 F. Supp. 2d 164 (D.D.C. 2011)

*D'Amico v. N.Y. State Bd. of Law Exam'rs*, 813 F. Supp. 217 (W.D.N.Y. 1993)

*Elder v. Nat'l Conf. of Bar Exam'rs*, No. C 11-00199 (N.D. Cal. Feb. 16, 2011)

*Enyart v. Nat'l Conf. of Bar Exam'rs*, 823 F. Supp. 2d 995 (N.D. Cal. 2011)

*In the Matter of Chavis*, 306 A.3d 653 (Md. 2023)

*Jones v. Nat'l Bd. of Bar Exam'rs*, 801 F. Supp. 2d 270 (D. Vt. 2011)

*Munaf v. Geren*, 553 U.S. 674, 128 S.Ct. 2207, 171 L. Ed. 2d 1 (2008)

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1 (1st Cir. 2002)

*Orkin v. Albert*, 557 F. Supp. 3d 252 (D. Mass. 2021)

*Ramsay v. Nat'l Bd. of Medical Exam'rs*, 968 F.3d 251 (3d Cir. 2020), *cert. denied* (141 S. Ct. 1517 (2021)

*Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)

*Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020)

3

*Sampson v. Nat'l Bd. of Med. Exam'rs*, No. 22-CV-05120 (E.D.N.Y. Dec. 2, 2022), *rev'd on other grounds*, No. 23-3 (2d Cir. 2023)

*Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)

4

<h1 style="text-align:center"><u>INTRODUCTION</u></h1>

Plaintiff, RR, respectfully moves this Honorable Court for an Emergency Temporary Restraining Order (TRO) or, in the alternative, expedited preliminary injunctive relief, pursuant to Fed. R. Civ. P. 65(b), against Defendant, National Conference of Bar Examiners (NCBE), for its repeated and ongoing violations of RR's rights under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq*,[1] specifically, Title III, 42 U.S.C. § 12181 *et seq.*[2] NCBE has discriminated against RR in numerous ways since last summer (2025), first and foremost, by repeatedly and unlawfully denying her full requested accommodations on the Multistate Professional Responsibility Exam (MPRE), which NCBE creates and administers nationwide. **RR is scheduled to take the MPRE in 2 days from the filing of this motion, on Wednesday, March 25, 2026.** RR is a person with disabilities under the ADA, the statutory basis for the present motion. Since July 2025, RR has attempted to receive her necessary accommodations on the MPRE.

RR's attempts continue, now before this Court from which she seeks immediate, emergency relief to prevent the ongoing and irreparable harm that has, is, and will immediately occur as a result of NCBE's discrimination against RR's within the meaning of the ADA. Specifically, RR requests this Court to enjoin NCBE from denying her full requested accommodations on the MPRE: **100% extended time (i.e. double-time) and up to 15 minutes of stop-the-clock break time.** Furthermore, given the short amount of time RR had to prepare this fact-intensive case against the gatekeepers of the legal profession, RR's chosen field, and the looming date of her next-scheduled MPRE, RR requests this honorable Court to treat the present motion as an emergency. Given the imminence and irreparability of the harm she faces, her continuous efforts to inform NCBE of its legal violations, combined with the harm NCBE has already caused her, it is entirely appropriate for this Court to rule on and grant RR's motion *ex parte.*

In this case, emergency relief is warranted, because, unlike many of the cases discussed, there is

---

[1] Unless otherwise noted, citations to the ADA are to the current law, as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), and codified at 42 U.S.C. § 12101 *et seq.*

[2] Note that this motion is brought specifically under Title III of the ADA, despite the Count 2, *see Complaint*, being brought under the Section 504 of the Rehabilitation Act of 1973.

no dispute on disability. The only question before the court is: Was RR provided the full accommodations she was legally-entitled to? RR's request for double-time as recommended by her qualified professional, does not fundamentally alter this test and, as her psychoeducational evaluation demonstrates, is necessary to best ensure that the MPRE reflects RR's aptitude, as required by law. In fact, this accommodation is routinely given. Up to 15 minutes of stop-the-clock break time is perfectly reasonable on what should be a 4-hour exam with 100% extended time. RR acknowledges the emergency posture of this motion, but the record is such that the Court can comfortably grant the requested ex parte TRO because NCBE has already conceded that RR has disabilities within the meaning of the ADA. Therefore, this Court should and will find that NCBE's conduct towards RR is discriminatory per se under the ADA, and NCBE should be held fully accountable for its violation of the law. The organization that tests applicants across the country on the law must be held to the law.[3]

## I. FACTUAL BACKGROUND

### A. RR's Disabilities and Academic Success

RR was born very prematurely, at 28 weeks, weighing 2 pounds, 10 ounces, spending 6 weeks in the Neonatal Intensive Care Unit (NICU). *See* Compl. ¶¶ 37-41. Prematurity, combined with very low birthrate is well-established as directly correlating to a range of disabilities, including most of RR's. *See id.* and accompanying notes. Fortunately for RR, not only did she survive birth and infancy, she *excelled* and surmounted immense challenges facing her due to her disabilities, including ugly discrimination as a child. *See* Compl. ¶ 58. Unfortunately for NCBE, RR now comes before this Court determined to surmount NCBE's discrimination too and to vindicate her own legal rights, as well as those of what the facts here indicate are the many other individuals similarly placed and similarly denied their legally entitled accommodations due to NCBE's disregard for disabilities laws, like the ADA.

#### 1. Documented History of RR's Disabilities

RR has a long, documented history of disabilities, particularly of learning disabilities and ADHD.[4] *See* Compl. ¶¶ 24-76; Ex. D-2, RR, Personal Narrative (submitted to NCBE July 30, 2025). At

---

[3] Moreover, unlike RR, the plaintiffs in the cases discussed here, *see infra*, did not begin their cases on a *pro se* basis.

age 10, during fifth grade, RR received her first psychoeducational evaluation due to the difficulties she had been experiencing in school and that her parents wanted examined by a qualified professional. *See* Ex. A-11, Psychoed. Eval. of RR by Dr. Louise Hozid, Ed.D., at 1 (Feb. 2000). RR's 2000 evaluation concluded that RR met the criteria for diagnoses of a nonverbal learning disability and Attention Deficit Disorder Without Hyperactivity. *Id.* at 16. Among the many observations Dr. Hozid made in her 2000 psychoeducational evaluation of RR was her difficulty in the area of reading comprehension. *Id.* at 12. Dr. Hozid also gave the first documented recommendation that RR receive extended time generally as an accommodation for academic testing. *Id.* at 17.

In June 2004, following 9th grade (at age 14), RR was re-evaluated jointly by Dr. Louise Hozid (again) and Dr. Allen Brown. *See* Ex. A-10, Psychoed. Eval. of RR by Louise Hozid, Ed.D. & Allen J. Brown, Ph.D. (June 2004). As in 2000, the "diagnostic formulation that [RR's] cognitive functioning and learning are compromised by a nonverbal learning disability and ADHD without hyperactivity are again supported by the results of this evaluation." *Id.* at 8. **RR's 2004 evaluation maintained and reiterated her need for an unspecified amount of extended time on all tests, both in school and on standardized exams, stating that her "need for extended time is clearly indicated by the results of this assessment,"** *Id.* at 8, and emphasizing that extended time was "[t]he *only* accommodation that [RR] has found helpful to date . . . ." *Id.* at 9 (emphasis added).

### 2. RR's Testing Accommodations and Consistently High Academic Achievement

Despite RR's disabilities, for which she has received formal academic accommodations since the age of 10 (sixth grade). She has also consistently received accommodations on all timed standardized tests and has never been denied her requested, professionally-recommended, documented accommodations until now, beginning with NCBE's August 2025 denial of most of RR's requested accommodations on the MPRE. *See* Ex. D-3, NCBE, Accommodations Partial Denial (Aug. 26, 2025) (denying 100% extended time, i.e. double-time, and up to 15 minutes of stop-the-clock break time and granting only 50% extended

---

⁴ The *DSM-5*, published in 2013, changed the ADHD categorization from "types" to "presentations" and includes examples of symptom manifestation during different periods of a person's life.

7

time, i.e. time-and-a-half). Moreover, RR has been very successful academically, both in school and on standardized tests. During high school, for example, she was consistently on the high honor roll and obtained very high scores on all of her standardized tests, including the PSATs, SATs, and SAT Subject Tests. RR was accepted early decision to Carleton College, where she continued to excel, graduating *magna cum laude*, with distinction in both her major and on her senior thesis project and with honors for her membership on Mortar Board, of which she was Vice President.

RR could not obtain a new psychoeducational evaluation leading up to the GREs, which she took twice in Tel Aviv, Israel, where she lived for a year after spending a year teaching in Guadeloupe. As she describes her Personal Narrative, submitted to NCBE as part of her initial accommodations application, RR describes the extensive ameliorative measures she took to obtain a decent score on that exam, which were far inferior to those she had received on all prior standardized tests she had ever taken in her entire life. *See* Ex. D-2 at 1-2. As evidenced by NCBE's third and last denial of RR's appeal, sent after work hours on February 9, 2026, *see* Ex. D-9, NCBE, Appeal Denial, in which it gratuitously mentions RR's GREs for the very first time, NCBE never bothered to look at any of Dr. Fontaine's evaluations, including its own required one from July 2025, much less RR's own words from her Personal Narrative. *See* Ex. A-2, Psychoed. Eval. of RR by Eve Fontaine, Ph.D. PLLC (July 2025), at 7 (explaining that RR's GRE scores do not reflect her aptitude and discussing the extensive ameliorative measures taken in advance).

### 3. Documented Current State of RR's Disabilities

After moving to Durham, NC in 2013 to begin a Ph.D. program at Duke University, RR had to find a new psychoeducational evaluator. Dr. Eve Fontaine, RR's current psychoeducational evaluator, has known RR for 12 years and conducted her first evaluation of RR in 2014, specifically for the LSAT exam (and as part of RR's official registration with Duke's Student Disability Access Office, SDAO). *See* A-7, Psychoed. Eval. of RR by Eve Fontaine, Ph.D. PLLC (Aug. 2014). That evaluation, which is extensively summarized in both Dr. Fontaine's 2019 and 2025 re-evaluations of RR,[5] set the groundwork for her

---

[5] Note that, to avoid any confusion, each "re-evaluation" of RR by a psychoeducational evaluator will generally be referenced simply as another "psychoeducational evaluation."

8

subsequent *re*-evaluations. Dr. Fontaine's thorough descriptions help shed light on the effects of RR's

disabilities in relation to her aptitude and how accommodations, especially extended time, can allow her

to actually reach her aptitude:

> [RR's] Academic Fluency score is significantly below her overall cognitive functioning. These difficulties are consistent with her slower processing speed. Her Academic Skills score is significantly higher, which indicates that [RR] possesses strong academic skills overall. However, there is a large and significant discrepancy between these academic skills and her ability to complete academic tasks under timed conditions. . . . Given her weak fluency performance, [RR] is not able to demonstrate her true knowledge and skills under timed constraints.

*Id.* at 9.

As her health, including her disabilities, have evolved over time, so have her accommodations

needs, especially with respect to timing on tests. In addition to gradual decompensation with time,

intervening life events or diagnoses, especially RR's ongoing post-concussive syndrome and CPTSD.

Although she received 50% extended time (time-and-a-half) until 2016, RR's increased struggles with the

symptoms of her disabilities, which had begun several years earlier (she had been given unofficial time

extensions to complete papers her first two years there before she began at Duke Law. Her increased

struggles with completing assignments and timed tests, in particular, became very evident during her first

year of law school and led her medical professionals and Duke disabilities case managers to recommend

and implement 100% extended time (double-time) for RR on tests, as well as a minimal-distraction

testing environment, which she had already been granted informally for two semesters. *Compare* Ex. B-2,

Duke Accommodations Agreement (Aug. 2016), *with* Ex. B-5, Duke Accommodations Agreement (Aug.

2014).[6]

Dr. Fontaine evaluated RR for the second time in 2019 (for the MPRE no less, which RR decided

not to take at that time in order to focus on her research and other academic pursuits). In 2019, Dr.

Fontaine recommended the available accommodation of 100% extended time (double-time) on all tests,

including the MPRE. *See* Ex. A-6, Psychoed. Eval. of RR by Eve Fontaine, Ph.D. PLLC (April 2019), at

24. This change in her recommendations from 2014 to 2019 is extensively substantiated, both

---

[6] *See also* Ex. B-3, Letter from Amanda Singer, Ph.D. & Ellen Walker to Duke (July 2016) (urging review of RR's accommodations for increase in time extension); Ex. B-1, Duke Certification of Accommodations.

9

quantitively, based on the full battery of tests administered, and qualitatively, based on her multiple interviews with RR, as well as her prior knowledge of RR, her disabilities, and relevant accommodations needs, not to mention the significant intervening event of RR's massive concussion in December 2016 and subsequent diagnosis of post-concussive syndrome in August 2018 by Duke Neurology. In fact, Dr. Fontaine administered very specific tests in 2019, the results of which were again reflected in the tests she administered to RR for her most recent evaluation in July 2025. *See* Ex. A-2 at 2-3 (describing in detail RR's concussion, post-concussive syndrome symptoms, and their impact on her other disabilities); Ex. A-6 at 2-3 (describing the same). Dr. Fontaine also notes in her evaluation that RR's disabilities symptoms, especially those related to her ADHD, "worsened following her concussion in 2016" and the subsequent onset of her *ongoing* post-concussive syndrome. Ex. A-6 at 19. Combined with other test results and observations, reflecting greater impairments as a result of RR's disabilities than had been present in 2014, Dr. Fontaine increased her extended time recommendation for RR on tests from 50% to 100%. *Id.* at 24.

When Dr. Fontaine evaluated RR in 2025, she found the same conditions still affected RR, particularly with respect to her exacerbated ADHD symptoms. Ex. A-2, at 25. This finding was one of the many factors that went into her determination **that RR's accommodation of 100% extended time on tests, including the MPRE, remained necessary.** *Id.* ("[RR] *continues* to exhibit *frequent and impairing* ADHD symptoms." (emphasis added)). RR's erratic sleep patterns, due in significant part to her post-concussive syndrome, but which had been present to a lesser extent beforehand, are also reflected in a formal 2020 clinical sleep study. *See* Ex. F-1, Sleep Study (2020); *see also* Ex. F-2, Sleep Study (2015).

**B. Multistate Professional Responsibility Exam (MPRE) and Accommodations Requests**

*1. Significance and Format of MPRE*

The MPRE is not simply required to become a member of the Bar in the state where RR is attempting to become one (Massachusetts), passing it is also a pre-requisite just to *take* the Bar Exam, unlike every other jurisdiction besides Puerto Rico. The MPRE consists entirely of 60 multiple-choice questions in the form of hypotheticals that one must *read* to be able to correctly answer the question. As demonstrated in the documentation submitted to NCBE, RR has a long-documented specific learning

10

disability *in reading, see* Ex. A-2; Ex. A-6; Ex. A-7, contrary to NCBE's suggestion otherwise based on a cherry-picked, misunderstood detail about the Nelson-Denny Test. *See* Ex. E-6 Email from NCBE to RR (Oct. 16, 2025). That email was in reply to RR's requesting, *inter alia*, a "more detailed explanation of [NCBE's] decision on [her] reconsideration request." *See* Ex. E-5, Email from RR to NCBE (Oct. 16, 2025).

### 2. *NCBE's Procedures for Accommodations Applications and Appeals on MPRE*

NCBE has different, rigorous guidelines for six categories of disabilities. *See, e.g.,* Ex. G-5 to G-9, NCBE, various *Guidelines* webpages on documentation (relevant to RR). Dr. Fontaine followed all of NCBE's requisite guidelines in her July 2025 evaluation. *See* Ex. A-2. NCBE offers two processes to effectively appeal or dispute an accommodations determination: a reconsideration request, which "require[s] additional documentation that is new, substantially different from what you submitted previously, relevant, and material," or a plain appeal, which "does not require submission of any additional documentation." *See* Ex. G-10, NCBE, *MPRE Test Accommodations Decisions.*[7]

### C. NCBE's Repeated Denials of RR's Accommodations

NCBE is the first entity, institution, or individual to deny RR her requested accommodations, always as recommended by her own qualified professionals (whether her medical providers, her disabilities case managers at school, or, as has been the case for nearly all standardized tests until now, her most recent psychoeducational evaluation). After months preparing the requisite documentation, writing the application and a personal narrative, and undergoing an exhausting psychoeducational evaluation that was never considered by NCBE, which required it of RR, she submitted her application on July 30, 2025 (also the same day Dr. Fontaine was able to send RR her complete evaluation to submit to NCBE). *See* Ex. D-1, Accommodations App./Summary (July 30, 2025); Ex. D-2. RR included an abundance of documentation as part of that application, much of it current or recent, including the NCBE-required

---

[7] Once one receives a decision on an appeal or reconsideration, and the exam is under 5 weeks away, one cannot risk submitting a new reconsideration request or appeal (the former would have been the only option for RR after doing an appeal). *See* Ex. G-10. And since one has somewhere between 12 and 48 hours to register after receiving a decision (to this day, RR did not know the exact length of time, nor was it revealed to RR would even have a chance to appeal/request reconsideration after the July 30, 2025, deadline until it was upon her.

11

psychoeducational evaluation conducted that same month (July 2025) by Dr. Eve Fontaine. *See id.* at 7-8 (listing the 22 documents originally submitted to NCBE). On August 26, 2025, NCBE sent RR a letter denying the majority of her requested accommodations. *See* Ex. D-3.

Following NCBE's initial denial of RR's full accommodations request and failure to provide an appropriate explanation, RR was forced to spend a month obtaining additional documentation and consulting with people, costing her even more money and time than the months and thousands of dollars already invested and which anyone without the financial resources would not be able to do. *See* Ex. D-4, Reconsideration Request/Summary (Sep. 25, 2025). Moreover, because of the lack of information provided in NCBE's initial denial of her full requested accommodations, she had to engage in a "guessing game" and removed the requested and recommended accommodation of up to 15 minutes of stop-the-clock break time, thinking that that was somehow the reason for the denial. *See id.* It became clear later that that was not the case, which is why she is requesting that same accommodation now, along with 100% extended time. NCBE denied her reconsideration request on October 15, 2025, at which point, she had no additional opportunity to either request reconsideration or to appeal NCBE's unlawful denials. *See* Ex. D-6, NCBE, Reconsideration Denial (Oct. 15, 2025). In that letter, NCBE merely states that she had provided "no new information . . . that would justify [further] accommodations." *See id.* This is factually untrue and reflective of NCBE's repeated violations of the ADA since summer 2025 in refusing to grant RR her full requested accommodations. Indeed, the documentation RR obtained for her reconsideration request included a psychiatric report from Dr. Michael Hirsch, RR's psychiatrist for almost 6 years now (also recommending 100% extended time on the MPRE), the results of the two clinical sleep studies RR underwent in 2020 and 2015, another letter from 2016 regarding RR's need for the increased accommodations Duke then granted her, as well as an addendum from Dr. Fontaine to her psychoeducational evaluation conducted 2 months prior. *See* A-5, Michael Hirsch, M.D., Psych Rep. of RR (Sep. 2025); Ex. F-1; Ex. F-2; Ex. B-4, Letter from Amanda Singer, Ph.D. to Duke (Apr. 2016); Ex. A-3, Eve Fontaine, Ph.D., Add. to 2025 Eval.; D-5, RR, Letter for Reconsideration Request.

After having both the MPRE and Bar Exam delayed, RR again appealed the NCBE's unlawful

12

denial of her necessary accommodations (specifically, 100% extended time, since she had "guessed" that that additional accommodation request could be the "real" grounds for NCBE's initial denial). *See* Ex. D-7, Appeal/Summary (Jan 22, 2026). In a letter submitted with her appeal, RR once again explicitly warned NCBE of its multiple legal violations. *See* Ex. D-8, RR, Letter for Appeal (submitted to NCBE Jan. 22, 2026). NCBE acknowledged, without further comment, receipt of that "personal statement" in its appeal denial, the last communication before notice of this present case.[8] *See* Ex. D-7; Ex. D-8; Ex. D-9.

RR ultimately determined that she could neither risk failing the MPRE, nor have NCBE's unlawful refusals to grant, at least 100% extended time, an accommodation she has *had* to use to the fullest extent on every test she has taken for the last 10 years. In addition to preparing her case before this Court, she has both the looming dates of the MPRE itself, currently scheduled for March 25, 2026, as well as the April 1, 2026 deadline to submit accommodations applications for July administration of the MA Bar Exam, which RR cannot take without passing the MPRE, and which has already been delayed due to the delay in her ability to take the November 2025 MPRE as planned.

## II. LEGAL STANDARDS

### A. Four-Part Framework for Preliminary Injunctive Relief, Including a TRO

To determine whether injunctive relief, including a TRO, *see, e.g., Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021), should be granted to RR, this Court must apply a four-factor test, as the First Circuit has reiterated (and refined) for decades:

> We have erected a four-part framework for district courts to use in determining whether to grant or deny a preliminary injunction. Under this framework, a district court is tasked with considering the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.

*Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). As *this* Court recently noted, out of those four factors, "[t]he first and second factors are the most important, and courts consider them in tandem," *Orr v. Trump*, 786 F. Supp. 3d 397, 416 (D. Mass. 2025) (internal quotation marks and citations

---

[8] Regarding notice, *see* exhibits in Series H.

13

omitted), with "[t]he movant's likelihood of success on the merits weigh[ing] most heavily . . . as the sine qua non of preliminary injunctive relief." *Ryan*, 974 F.3d at 18, *quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

Preliminary injunction, especially an emergency TRO, "is an 'extraordinary and drastic remedy' that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011), *quoting Munaf v. Geren*, 553 U.S. 674, 689-90, 128 S.Ct. 2207, 171 L. Ed. 2d 1 (2008) (citation omitted). This Court, however, should grant such relief to RR here, particularly in light of her very high likelihood of success on the merits, based on the irreparable harm NCBE has already caused RR and that she now imminently faces yet again if NCBE continues its ongoing failures to abide by the ADA by granting RR's initial accommodations request in full: 100% extended time (double-time) and up to 15 minutes of stop-the-clock break time. *See* Ex. D-1, Accommodations App. (July 2025).

**B. Standards and Principles Relevant to Emergency Issuance of an Ex Parte TRO**

Pursuant to Federal Rules of Civil Procedure, "to justify an ex parte temporary restraining order ("TRO"), a plaintiff must provide: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney [here, plaintiff, pro se] certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(A)–(B). RR has given notice and is currently being discriminated against by NCBE while facing the imminent administration of the MPRE on March 25, 2026.

RR requests that this Court exercise its wide discretion here and rule on the motion before it. While RR is one individual, NCBE is a national organization accustomed to exactly the type of claim in question here—one brought by a person with disabilities unlawfully denied their testing accommodations under the ADA—in a case most potential plaintiffs in this situation would not have the gumption nor resources to put together under such time constraints and pressure. Denying RR the ability to vindicate repeatedly violated rights (violations she diligently and repeatedly put NCBE on notice of, all the way through her latest appeal of its initial denial of her full accommodations request, *still* without adequate

14

explanation. Denying RR the opportunity to vindicate her civil rights now would merely enable an

organization that has shown RR and its obligations towards her under the ADA, the same disregard as it

has so many others.[9] Finally, as described more fully in RR's verified complaint, the process of compiling

the present case has been grueling, given the time constraints, her exacerbated disabilities, and other

extenuating circumstances. *See* Compl. ¶¶ 107-109.

### III. ARGUMENT: NCBE'S DISCRIMINATION AGAINST RR

This Court should allow RR's motion and enjoin NCBE from further discrimination against her

by ordering that she receive her full requested accommodations on the MPRE.

#### A. RR Is Highly Likely to Succeed on the Merits

To succeed on the merits of a claim alleging discrimination under Title III of the Americans with

Disabilities act, against a testing agency pursuant to 42 U.S.C. § 12189, RR must prove: (1) that she is a

person with disabilities within the meaning of the ADA; (2) that her requested accommodations will best

ensure that the MPRE demonstrates her aptitude while not fundamentally altering the nature of the

examination, and; (3) that those requested accommodations were denied. *See Ramsay*, at 257 (proof of

disability element); *Jones*, at 282 (D. Vt. August 2, 2011) ("best ensure" framework under 42 U.S.C. §

12189). *See also Berger, supra* (three part test, generally).

##### 1. Legal and Regulatory Background of ADA and ADAAA

Congress enacted the ADA:

"[T]o provide a clear and comprehensive national mandate for the elimination of
discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In doing
so, Congress recognized that "discrimination against individuals with disabilities persists
in such critical areas as employment... education ... [and] communication" and that "the
continuing existence of unfair and unnecessary discrimination and prejudice denies
people with disabilities the opportunity to compete on an equal basis and to pursue those
opportunities for which our free society is justifiably famous, and costs the United States
billions of dollars in unnecessary expenses resulting from dependency and

---

[9] *See, e.g., In the Matter of Chavis*, 306 A.3d 653 (Md. 2023); *Jones v. Nat'l Bd. of Bar Exam'rs*, 801 F. Supp. 2d 270 (D. Vt. 2011); *Bonnette v. D.C. App. Ct.*, 796 F. Supp. 2d 164 (D.D.C. 2011) (NCBE was also defendant); *Enyart v. Nat'l Conf. of Bar Exam'rs*, 823 F. Supp. 2d 995 (N.D. Cal. 2011); *Elder v. Nat'l Conf. of Bar Exam'rs*, No. C 11-00199 (N.D. Cal. Feb. 16, 2011). *See also Sampson v. Nat'l Bd. of Med. Exam'rs*, No. 22-CV-05120 (E.D.N.Y. Dec. 2, 2022), *rev'd on other grounds*, No. 23-3 (2d Cir. 2023); *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1517 (2021); *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-cv-99 (S.D. Ohio Aug. 27, 2019); *D'Amico v. N.Y. State Bd. of Law Exam'rs*, 813 F. Supp. 217 (W.D.N.Y. 1993).

15

nonproductivity." 42 U.S.C. §§ 12101(a)(3), (a)(8).

*Jones*, at 282. The ADA requires NCBE, as an entity that offers a professional licensing examination, to

"offer such examinations ... in a place and manner accessible to persons with disabilities or offer

alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. The regulations that

implement this mandate provide that NCBE:

> must ensure that the examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability... the examination results accurately reflect the individual's aptitude or achievement level ... rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309(b)(1)(i) (emphasis supplied), *quoted in Jones*, at 282-283.

The question of whether someone has a disability that is covered by the ADA, a District Court should

look to the ADA's own definition:

> The ADA defines "disability" in relevant part as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). We construe the term "disability" broadly. Id. § 12102(4)(A). As to the term "impairment," the applicable Department of Justice ("DOJ") regulations provide that the term "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities." 28 C.F.R. § 36.105(b)(2). As to "life activities," the ADA provides that "major life activities include ... reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Finally, the regulations explain that "[a]n impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). Accordingly, "'[n]ot every impairment will constitute a disability...,' but [an impairment] will meet the definition [of disability] if 'it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'"

*Ramsay*, at 257 (citations omitted). In the context of a learning disability, specifically, "a clinical

diagnosis . . . is typically based upon a comparison between the individual and others in the general

population who are of similar age and have received age-appropriate education." *Id.* at 258.

In determining whether a disability "substantially limits" an individual, that term is to be given broad

construction:

> The regulations also state that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," and "is not meant to be a demanding standard." 28 C.F.R. § 36.105(d)(1)(i). Therefore, "the 'substantially limits' inquiry 'should not demand extensive analysis,'" and

16

"'[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.'"

*Sampson, supra, citing Ramsay*, at 258-59 (in turn, *quoting* 28 C.F.R. §§ 36.105(d)(1)(ii), (vii)).

Importantly, the regulations serve up a firm reminder of where the analytical focus of an ADA claim should lie:

> The primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

*Sampson, supra, quoting* 28 C.F.R. § 36.105(d)(1)(ii).

Finally, and perhaps **most relevant here is the requirement of an individualized assessment to determine not only disability, but also appropriate accommodations:**

> "The determination of whether an impairment substantially limits a major life activity requires an individualized assessment." Such assessments benefit from the reports of professionals who know or have personally examined the individual. Because such examinations allow the professional to evaluate the individual's behavior, effort, and candor, DOJ understandably has stated that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from ... reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." **As a result, DOJ has directed that testing entities "shall generally accept" "documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested ... and <u>provide the accommodation.</u>"**

*Ramsay*, at 260, *quoting* 28 C.F.R. § 36.105(d)(1)(vi) (emphasis added).

### 2. *RR Has Multiple Disabilities Within the Meaning of the ADA, and NCBE Has Repeatedly Failed to Provide Her Requested Accommodations, As Recommended by Dr. Fontaine*

NCBE has already conceded that RR is has a disability requiring accommodation within the meaning of the ADA because they have already given her partial accommodations. Thus, unlike other cases, such as *Sampson,* where the Court had to resolve the threshold factual question of whether a disability lay at all, here the Court need only resolve whether NCBE discriminated against RR by not providing her full requested accommodations. **They did.**

17

Dr. Fontaine is a "qualified professional" within the meaning of the ADA. She has been RR's

psychoeducational evaluator for over 12 years and has extensive first-hand knowledge of RR's conditions.

At the behest of Defendant's requirements, Dr. Fontaine administered a rigorous, individualized and in-

person psychoeducational evaluation of RR in the summer of 2025. After assimilating the wealth of data

she collected from several qualitative tests, conducting structured and unstructured interviews of RR, and

patiently observing RR while she competed these tests, Dr. Fontaine then applied her professional

expertise, and came to several conclusions. Of note:

> Given [RR's] history of a Specific Learning Disorder (Reading), her reading vocabulary,
> rate, and comprehension skills were assessed using a measure that measures performance
> under extended time conditions. [RR]'s reading speed measured significantly lower than
> expected, given her Very Superior overall cognitive functioning, verbal reasoning skills,
> vocabulary and reading comprehension skills. She continues to meet the diagnostic
> criteria for a Specific Learning Disorder with Impairment in Reading (Fluency). These
> test results were consistent with [RR]'s previous test results, diagnoses, and history of
> receiving extended time on testing. [RR] is clearly at a disadvantage compared to her
> peers and continues to need extended time on tests and exams in order to demonstrate her
> true knowledge and skills.

Ex. A-2 at 25. Of further note:

> In general, [RR's] test results place her at a significant disadvantage when compared to
> her peers in the general population. Current findings are consistent with [RR]'s prior
> testing, which supported her approved requests for test-taking accommodations.
> Specifically, [RR] previously received extended time (50%) on the PSAT, SAT, AP
> exams, LSAT, and on tests/exams throughout high school and college. During law school
> and graduate school, [RR] continued to receive formal testing accommodations. Of note,
> her accommodation plan was modified to include (100%) on exams during graduate
> school when her cognitive functioning was further impaired, secondary to concussions
> and subsequent diagnoses (post concussive syndrome and recurrent migraines). [RR]
> consistently utilized her testing accommodations in order to complete her exams and
> would not have been able to finish them without receiving the additional time.

Ex. A-2 at 27. There is no doubt that Dr. Fontaine's evaluation was a "individualized assessment" within

the meaning of 28 C.F.R. § 36.105. Just like the in *Sampson*, here: "Based on this entire body of evidence,

Dr. [Fontaine] found that [RR] met the criteria for a DSM-V diagnosis of Specific Learning Disorder with

impairment in reading (reading fluency and reading comprehension) . . . ." *Sampson, supra*.[10]

---

[10] Aside from the Federal Regs, Courts have also upheld the findings of individual assessments over that of testing
agencies for another more familiar reason, evidentiary credibility: "First, it is within the trial judge's discretion to credit a
physician with firsthand observations of a patient over one who only reviewed the patient's records. Such a professional

Moreover, also identical to the facts in *Sampson*, RR's treating psychiatrist, Dr Hirsch, "concluded based on clinical evaluations that his ADHD substantially impairs his concentration ability." *Sampson*, supra. *See* Ex. A-4, Affidavit of Michael Hirsch, M.D.[11] Therefore, just like in *Sampson*, NCBE should have "provide[d] the accommodation" of double time as Federal Regs command. *Ramsay*, 986 F.3d at 260. Like in Sampson, Dr. Fontaine's recommendations of double time and stop the clock breaks are more than reasons. NCBE for its part offered RR two, paltry reasons for their denial of her full accommodations. They offer them no assistance, and this Court should readily dispose of them for what they are: **pathetic excuses to justify their own discriminatory conduct.**

First, NCBE's first stated reason to RR that she did not deserve her full accommodation was that she performed well on previous standardized tests. RR is 36 years old, the last standardized test she took was the LSAT, over 12 years ago. From a timing perspective alone, this is patently absurd, but more importantly Federal Regulations and cases have **patently rejected this type of reasoning**:

> In fact, the Board's reliance on Ramsay's academic achievement was contrary to the regulations that explain that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people." 28 C.F.R. § 36.105(d)(3)(iii). Because Ramsay's high academic performance does not foreclose her from having a disability, the Court reasonably discounted the Board's experts' opinions, which focused mostly on Ramsay's academic accomplishments and ignored evidence of her limitations.

*Ramsay*, at 260-261.

NCBE next tried to defend its decision by stating that RR scored too highly on the "Nelson-Denny" reading test, a psychometric qualitative assessment of reading comprehension. *See* Ex. E-6. Here,

---

has the benefit of seeing how the patient actually acts and speaks and provides a perspective not limited to the cold record. This principle is not unlike the deference an appellate court gives to a trial court who physically sees a witness. This is why we rarely second-guess a district court's weighing of evidence, [...] and why it makes sense for the District Court to credit the professionals who personally met with Ramsay." *Ramsay,* at 259-260.

[11] Dr. Hirsch averred as follows: "As per my 2025 report, I believe that [RR] should receive *100% extended time (double-time) and fifteen-minute stop-the-clock breaks for the MPRE exam.* This conclusion is based on my treatment of her since April 2020 for Attention Deficit Hyperactivity Disorder, learning disabilities, and several other diagnoses that affect her cognition, including obsessive-compulsive disorder, anxiety, depression, complex post-traumatic stress disorder, and post concussive symptoms. My conclusion is also consistent with her 2025 psychoeducational evaluation, her 2019 psychoeducational evaluation, and Duke University's certification of her accommodations and support of her request for 100% extended time and stop-the-clock breaks of up to 15 minutes." Ex. A-4 at 1 (emphasis added).

19

NCBE is "cherry-picking" one data point out of many, that supports its conclusions. Just like their first reason, this approach, too, has been tried and rejected. In *Sampson*, the testing agency tried to do exactly the same thing: "NBME and its experts single out the results of specific psychometric tests for criticism, but Dr. Wasserstein relied on multiple measures in concluding that Sampson's reading and concentration abilities are substantially limited compared to most people in the general population." *Sampson, supra.* Just like in *Sampson*, Dr. Fontaine based her conclusions on her entire report. *See generally* Ex. A-2. This not only lends greater credibility to her findings over one single metric, but "cherry picking" as NCBE does here narrows the standard of disability to be "too exacting." This runs counter to 28 CFR 36.105's command that there be "no demanding standard." Not to mention, it is an insult to common sense that NCBE thinks it can pick one number and ignore the rest of the report.

Finally, it is worth pointing out **the truly perverted nature of NCBE's behavior.** They require RR to submit, at great cost of her own time and money, to a new psycho-ed evaluation under the guise of it being a part of a fair assessment her disabilities. In reality, they use it as a tool to discriminate against her by ignoring pretty much all of it and using only small parts to **justify their own discriminatory and unlawful conduct.** Unfortunately for NCBE, as stated above: **"The primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred**, not the extent to which an individual's impairment substantially limits a major life activity." *Sampson, supra, quoting* 28 C.F.R. § 36.105(d)(1)(ii). Here, NCBE's has not complied with its obligations, and has discriminated against RR by not providing her full accommodations. Therefore, this Court should find that RR is likely to succeed on the merits of her ADA claim.

**B. RR Faces Immediate, Irreparable Harm: Inability to Take March 2026 MPRE (and July 2026 MA Bar Exam), Already Unlawfully Delayed by NCBE**

As noted above, within the four-part framework for determining whether to grant RR preliminary injunctive relief, particularly where that relief is sought under emergency circumstances, as here, "[t]he first two factors are the most critical. Both require a showing of more than mere possibility. Plaintiffs

20

must show a strong likelihood of success, and they must demonstrate that *irreparable injury will be likely absent an injunction.*" *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (emphasis added); *see also Jones*, at 286. RR has been and continues to be unquestionably harmed by the NCBE's failure to provide RR with her requested reasonable accommodations, which she needs to the same access to the MPRE as enjoyed by the vast majority of non-disabled test-takers: 100% extended time and up to fifteen minutes of stop-the-clock time over what should be four hours. Unless enjoined by this Court, the NCBE's longstanding practices of violating the ADA and preventing individuals with disabilities from pursuing their chosen career at their chosen time, will continue to cause irreparable harm to RR immediately, since she is registered to take the MPRE on March 25th, 2026 and cannot do so unless provided with her full requested, recommended accommodations, as well as to the many other persons similarly situated and wanting to take the MPRE, an exclusive service of the NCBE and required to become a member of the MA Bar. RR is legally entitled to the full accommodations she originally requested on MPRE and has been consistently and currently recommended by actual qualified professionals per the ADA: 100% extended time (double-time), accompanied by up to 15 minutes of stop-the-clock breaks.

RR has already suffered enough harm at the hands of NCBE, the first and only entity or person to ever deny her requested, professionally recommended accommodations: Given the time constraints, the NCBE's repeated failures to abide by the laws and grant RR her full requested and recommended accommodations on the November 2025 MPRE ultimately caused her to cancel the appointment she had 48 hours to schedule following NCBE's unfounded and inexplicable denial of her reconsideration request, although it revealed in an email reply just how fruitless that month-long, costly, time-consuming endeavor had been. As a result of NCBE's denials and her inability to take the November 2025 MPRE, RR was then unable to take the Massachusetts Bar Exam at the end of February 2026, as she had planned. Without her full requested accommodations, she will not have the *access* to the exam mandated by the law, nor, in all likelihood, to the MA Bar Exam in July 2026, due either to her failure of the MPRE or failure to receive her accommodations on that exam due to NCBE's unlawful decision.

21

## C. Balance of Burden Tips Far in Favor of RR

RR is already and will continue to suffer irreparable harm in the immediate future because she will once again end up missing the MPRE, an exam essential to her entrance into her chosen profession, not to mention a pre-requisite for being able to sit for the Massachusetts Bar Exam. RR has been harmed enough. The primary accommodation of 100% extended time (double-time) that RR requires to best ensure reflection of her aptitude on the MPRE (and MA Bar Exam) is not only the recommendation of all her current and recent qualified professionals; it is also the time accommodation that RR has received and made full use of since 2016, including for nearly all law school exams (in fact, her school accommodations included a distraction-free environment in addition to double-time). RR has not been recommended nor received anything less than double-time as her main accommodation on all timed tests since summer 2016. As the court noted with respect to *Enyart*, "[c]ompared to the likelihood that Enyart would suffer irreparable harm by losing the chance to pursue her chosen profession in the absence of an injunction, the potential harm to NCBE resulting from injunctive relief was minimal." *Enyart*, at 1167.

NCBE on the other hand would not be burdened in any way by granting RR what is a standard accommodation that it already offers and grants to others, especially with respect to extended time, like the double-time RR has requested of NCBE and received on all tests for a decade. The short *up to* 15 minutes of stop-the-clock breaks, an accommodation that reasonably accompanies what should be a four-hour exam for RR merely allows her a bathroom break and/or stretch, without losing her full extended time accommodation, and does not warrant consideration as a burden on NCBE. Furthermore, NCBE already coordinates with Pearson Vue to administer the MPRE across U.S. jurisdictions and would have to do nothing more than grant RR her legally entitled accommodations and communicate that to Pearson Vue. Thus, the balance of hardships unquestionably favors RR, who has and will be both burdened and harmed if NCBE is permitted to persist in its refusal to grant RR her full requested accommodations on the MPRE, while NCBE will not incur a single burden other than contacting Pearson Vue, as is already a standard practice of NCBE in its administration of the MPRE.

## D. Granting RR's Motion Is in the Public Interest; Denying It Would Hurt that Interest

This Court has the authority to exercise its broad discretionary powers to hold accountable an organization that refuses to be held accountable, especially when it comes to the rights of persons with disabilities, obviously a class of people it would prefer not to have in the legal profession at all. As reflected in the First Circuit's recent decisions, this piece of the four-part test for preliminary injunctive relief necessitates consideration of the effects on the public interest, both of granting such relief and refusing it, which inherently implies examination of both favorability and harm to the public interest. The public interest is not only served by enabling a person like RR to become a licensed attorney; the public interest *demands* it. It would cause major injury to the public interest to prevent an intelligent, highly driven individual with exceptional and unique qualifications from becoming a *legally licensed* human rights defender, especially at this critical juncture in our country's history. RR wants to spend her life devoted to protecting the rights of other people. That is undeniable interest and desperate need of the public in the United States, not to the mention the world, at any moment in time, especially now. In fact, since it has continued other unlawful conduct that courts have already told NCBE to stop, for example, applying ambiguous "reasonable accommodations" and "access" standards, when the one it must apply, as courts and DOJ have all recognized, is the "best ensure" standard.

RR had planned to take the MA Bar Exam, which is only administered twice a year, at the end of last month (February 2026), was prevented from doing so by NCBE, and now desperately wants to take it July, after an undue delay caused by NCBE's unlawful conduct and practices and total disregard for RR or her rights, much less her feelings when sent offensive emails, even after pointing out how hurt she had been by certain remarks. It all apparently fell on deaf ears, which became yet more typical in her renewed 2026 attempts at effective communication with NCBE – efforts NCBE never once bothered or cared to reciprocate. RR has gone above and beyond anything required of her to keep NCBE on notice throughout this process of their unlawful conduct with regard to their assessment and determination to deny the bulk of RR's requested accommodations, which, in fact, even if the current year were 2015, would amount to drastically inferior accommodations, based purely on her additional accommodation of a distraction-free environment (automatically granted by the LSAC on her LSATs). For someone with ADHD, severely

compounded by her ongoing symptoms of post-concussive syndrome, and most of all, her CPTSD.

Finally, maintaining the status quo of a person's disabilities accommodations is most certainly in the public interest, since many people have disabilities requiring such accommodations, including RR. Moreover, since doing anything otherwise could easily prevent the public from having access to the quality representation and legal advocacy it unquestionably deserves to have, for example, in the arena of disabilities rights, as a person with disabilities is uniquely positioned to be an exceptional advocate in that particular arena, especially after tirelessly working to vindicate their own legal rights against a national organization that controls entry into their chosen profession. Just as persons with disabilities deserve true access to their own chosen profession, so too does the public deserve access to the best advocates available. Preventing persons with disabilities from ever entering the legal field would immediately and irreparably harm the public interest.

## CONCLUSION: EXTRAORDINARY RELIEF FOR EXTRAORDINARY VIOLATIONS

Extraordinary relief, such as granting a TRO *ex parte*, is meant for extraordinary legal violations. Such is RR's case before the Court and her present motion for a TRO *ex parte*, or, in the alternative, expedited preliminary injunctive relief. NCBE has repeatedly violated RR's rights, in flagrant disregard for the ADA. Injunctive relief is required to stop the ongoing harm to RR, others like her, and the public interest. The imminent harm she now faces after already being forced to delay taking the MPRE, to communicate excessively with NCBE to no avail, including repeated notice of their legal violations, and to prepare the present case warrant expedition of that relief via an ex parte TRO.

*Respectfully submitted,*

RR

RR, *pro se*                                                                 DATED: 3/23/26

24